**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| TYSON WARDLEIGH, and CHRISTOPHER HAYES, | **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| vs. | Case No. 1:07-cv-108 |
| SHERIFF BRAD SLATER, WEBER COUNTY, and JOHN AND JANE DOES 1-10, | Judge Clark Waddoups |
| Defendants. | |

## INTRODUCTION

This action is brought by Plaintiffs Tyson Wardleigh and Christopher Hayes.  Plaintiffs allege they were mistreated by other prisoners in the Weber County Jail.  Plaintiffs have brought 42 U.S.C. § 1983 claims against Sheriff Brad Slater and Weber County for violations of their rights under the Eighth and Fourteenth Amendment.  Specifically, Plaintiffs claim that the Defendants had a custom and practice of lax enforcement of safety rules and that Defendants failed to protect them.

Now before the court are Defendants' motion for summary judgment (Doc. No. 44) and Plaintiffs' motion for sanctions for spoliation of evidence (Doc. No. 49).  After due consideration of the memoranda, documents, oral argument, and the facts and law relevant to this matter, the court GRANTS Defendant's Motion for Summary Judgment and DENIES Plaintiffs' Motion for Sanctions due to Spoliation of Evidence for the reasons explained below.

## FACTUAL BACKGROUND

From about May 18 to May 23, 2007, Plaintiffs were detained in the Weber County Jail while they awaited trial on misdemeanors.  On May 22, Plaintiffs were moved from a secure housing area where they were cellmates to a more open dorm-style room that housed 12 inmates. Shortly before 11:00 p.m that night, several other inmates told Plaintiffs they would either have to strip naked and walk around the cell masturbating, perform oral sex on their cellmates, or be raped.

Mr. Wardleigh, scared of the possible consequences of not following orders, stripped naked, then twice walked across the cell and back to his bunk before putting on his clothes again. While Mr. Wardleigh moved naked through the cell, three of the inmates touched his buttocks. In addition to the verbal taunting from the other inmates in his cell, Mr. Wardleigh also states that the prisoners in the neighboring cell banged on the partition between the cells while he was naked.  Mr. Wardleigh put his clothes back on about two minutes after he took them off.

Next, Mr. Hayes briefly lowered his pants and underwear to the tops of his legs, pulled up his shirt to his waist, and walked around the cell.  When some of the other prisoners attempted to touch him as they had Mr. Wardleigh, Mr. Hayes avoided them and quickly returned to his bunk. These events took approximately one minute.  Both Plaintiffs admitted in their deposition that they did not know whether or not the guards in the control booth saw any of these events.[1]

---

[1] In the grievance letter Mr. Wardleigh submitted to jail officials, which is described below, Mr. Wardleigh alleged that officers were watching and laughing as the events took place.  The court does not consider this allegation in connection of this motion for two reasons.  First, the allegation is made in an unsworn statement, which is not competent evidence in a summary judgment proceeding.  Second, Mr. Wardleigh repudiated this allegation in his deposition when he admitted that he did not know whether any guards actually saw the events.

Plaintiffs also stated in their depositions that between a half hour and an hour after that initial incident, another inmate climbed on top of both of them and tried to turn them over to rape them while they were laying on their bunks.  Mr. Hayes and Mr. Wardleigh both resisted and got the inmate off their bunks without further incident.

Sheriff Slater is the sole and final policymaker for Weber County regarding jail policies. Plaintiffs do not dispute that Weber County has detailed policies and procedures designed to ensure the safety and security of the inmates at the jail.  Defendants have presented evidence that each of these procedures was followed on the night in question, and Plaintiffs present no direct and admissible evidence that jail officers otherwise.  First, upon admittance to the jail, prisoners are screened, evaluated according to objective criteria, and housed according to their resulting classification.  There is no dispute that jail officials followed this policy in making decisions about where to move the Plaintiffs on May 22.  Second, at night, guards are required to walk through each cell section at least every hour to insure the inmates are safe and secure.  In practice, guards patrol the areas approximately every 40 minutes.  On the night of May 22, as required, a guard passed Plaintiffs' cell just before 11:00 P.M. and finished the next walk-through approximately 30 minutes later at 11:24 P.M.  Neither guard reported observing anything unusual.  Third, the jail maintains guards in a control room that monitors the entire pod (6 housing units, 12 dorms, and 48 cells).  The control room was 67 feet from Plaintiffs' cell.  The control room officers have a variety of responsibilities, such as opening and closing secure doors, listening to concerns in each of the cells, letting people in and out of the section, and responding to individual inmate requests.  Though Plaintiffs say they saw two guards in the control room that night, Plaintiffs admit that they do not know what the guards saw or what they were doing during

the incidents alleged in the complaint.  Fourth, the jail maintains a range of informal and formal complaint procedures that inmates can use if they feel threatened or have been harmed.  During that night, the jail administration did not receive any request from Plaintiffs for help.

On May 23, the day after the incidents, Mr. Wardleigh's father bailed Mr. Wardleigh out of jail.  After Mr. Wardleigh told his father of the incident the previous night, his father called the jail to report the incident.  Sergeant Paul Stephens responded to the report and notified the Jail Commander, Captain Kevin Burton.  After receiving the phone call, Sergeant Stephens immediately removed Mr. Hayes from the cell and questioned him about the incident in a secure area.  Sheriff Slater was notified of the incident and the investigation by his Chief Deputy the next afternoon.

Mr. Wardleigh sent a "Level 1 Grievance against Weber County Correction Facility" on May 29, 2007.  He subsequently filled out an official grievance form on June 12, 2007.  Mr. Wardleigh filed this suit on August 8, 2007 and Mr. Hayes joined as a plaintiff later that month.

In accordance with Weber County's policy and practice, an investigator who did not work in the jail began an investigation into the alleged incident shortly after Mr. Wardleigh's father reported the incident.  To assist in the investigation, Captain Burton ordered a DVD copy of the digital camera that monitored Plaintiffs' cell.  The recording on the DVD showed movements in part of Plaintiffs' cell between 9:26 p.m. on May 22, 2007 and 1:25 a.m. on May 23, 2007.  The jail used this DVD for internal purposes and the Weber County District Attorney used the DVD to make charging and prosecutorial decisions regarding the other inmates in the cell.  On November 20, 2007, Plaintiffs requested from Defendants the recordings of the events on the incident night.  On February 6, 2008, approximately nine months after the original incident,

4

Plaintiffs requested two additional recordings.  Specifically, they requested the recording of

Plaintiffs' cell after 1:25 a.m. and the recording of the neighboring cell on the same night.  When

Captain Burton attempted to retrieve the requested recordings from the cameras, however, he

found that the footage had been overwritten on the digital recording system by more recent

footage.  Because the video surveillance system digitally recorded onto a hard drive, the new data

automatically overwrote old data when the drive reached its storage capacity.

On September 12, 2008, Defendants filed this motion for summary judgment.  On the

same day, Plaintiffs filed their motion for sanctions due to spoliation of evidence.

## ANALYSIS

### I.   SUMMARY JUDGMENT STANDARDS

"Summary judgment is proper if the evidence submitted by the parties, viewed in the light

most favorable to the non-movant, indicates that there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law."[2]  "A 'material fact' is one which

could have an impact on the outcome of the lawsuit, while a 'genuine issue' of such a material

fact exists if a rational jury could find in favor of the non-moving party based on the evidence

presented."[3]  Rule 56(e) requires that a party opposing summary judgment "may not rely merely

on allegations or denials in its own pleading" but must instead, "by affidavits or as otherwise

provided in this rule . . . set out specific facts showing a genuine issue for trial."[4]  Finally, "[o]nly

---

[2]   *Faustin v. City & County of Denver, Colo.*, 423 F.3d 1192, 1198 (10th Cir. 2005) (citations and internal quotation marks omitted); *see also* Fed. R. Civ. P. 56 (b)-(c).

[3]   *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1216 (10th Cir. 2000).

[4]   Fed. R. Civ. P. 56(e)(2).

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."[5]

## II.   PLAINTIFFS' § 1983 CLAIMS

Preliminarily, Defendants moved for summary judgment on claims for the failure to protect under § 1983, and Plaintiffs offered no argument in response.  The court has reviewed Defendants' motion and the grounds on which they moved and concludes that summary judgment on those claims is appropriate.  Accordingly, no further analysis on this part of the motion is needed.

Turning to Plaintiff's laxity claim under § 1983, the standards for proving such a claim are slightly different for municipalities and supervisors.  To prove municipal liability, Plaintiffs must first prove an underlying constitutional violation by a municipal employee.[6]  Next, Plaintiffs must identify a specific "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" that lead to the infliction of the injury.[7]  Finally, Plaintiffs "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[8]  Though there is no requisite mental state required for § 1983

---

[5]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[6]   *Ellis ex rel. Estate of Ellis v. Ogden City*, ___ F.3d ___, 2009 WL 4857085, *5 (10th Cir. Dec. 17, 2009).

[7]   *Nielander v. Board of County Com'rs of County of Republic, Kan.*, 582 F.3d 1155, 1170 (10th Cir. 2009) (citation omitted).

[8]   *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403 (1997).

liability, "plaintiff must establish the state of mind required to prove the underlying violation."[9]

"A showing of simple or even heightened negligence will not suffice."[10]  As a result,

"'[d]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor

disregarded a known or obvious consequence of his action."[11]

To establish a § 1983 claim against Sheriff Slater for unconstitutional acts of the jail

guards under his supervision, Plaintiffs "must first show the supervisor's subordinates violated

the constitution."[12]  If Plaintiffs can make this showing, they must then "show an 'affirmative

link' between the supervisor and the violation, namely the active participation or acquiescence of

the supervisor in the constitutional violation by the subordinates."[13]

For purposes of this motion, the court will assume without deciding that the events of

May 22, 2007 amounted to violations of Plaintiffs' constitutional rights.  Accordingly, the

analysis here focuses on the other parts of the relevant tests.

## A.    Weber County

Plaintiffs contend that Weber County should be held liable for a policy or custom of

allowing lax enforcement of prisoner safety rules that led to the violations at issue.  This claim

fails because Plaintiffs have not adduced any admissible evidence that such a policy or custom

---

[9]  *Id.* at 405.

[10]  *Id.* at 407.

[11]  *Id.* at 410.

[12]  *Serna v. Colorado Dept. of Corrections*, 455 F.3d 1146, 1151 (10th Cir,. 2006) (citations omitted).

[13]  *Id.*

actually existed.  For example, Plaintiffs have presented no evidence of a single other incident or allegation of sexual abuse of a Weber County Jail detainee that resulted from poor rule enforcement.[14]

Plaintiffs do point to testimony from one jail guard who was on duty on May 22, 2007 that the guard had at some time seen other guards play a game on a jail computer.  Plaintiffs contend that it could be inferred from this testimony that jail guards played computer games frequently enough to constitute a custom and that they did so on the night in question.  But there is no evidence that the guards were distracted by computer games on the night in question.  Nor do Plaintiffs provide any evidence that computer game playing presented a pervasive or consistent distraction or was otherwise widespread among the guards.  To the contrary, there is evidence that jail guards were punished if they were caught playing computer games while on duty.  Accordingly, it would be unreasonable to use the guard's testimony alone as evidence of a custom of guards ignoring prisoner safety to play computer games.

Plaintiffs also argue that in some cases, courts have decided that one instance of behavior is evidence of a custom or practice.  They maintain that the incidents here are by themselves evidence enough to get their claims to a jury.  But the law is clear that "proof of a single incident of unconstitutional activity is ordinarily not sufficient to impose municipal liability."[15]  Rather, "where a plaintiff seeks to impose municipal liability on the basis of a single incident, the

---

[14]   Hearsay statements from other prisoners are not admissible on this issue.

[15] *Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009).

plaintiff must show the particular illegal course of action was taken pursuant to a decision made

by a person with authority to make policy decisions on behalf of the entity being sued."[16]

Here, Plaintiffs have shown no evidence that reasonably supports the conclusion that

what happened on May 22 was the result of a deliberate decision by Sheriff Slater or any other

Weber County policy maker.  In fact, Plaintiffs have done nothing to contradict the evidence by

Weber County that there were detailed safety rules in place at the jail that were followed on that

night.

Plaintiffs's citation to *Pembaur v. City of Cincinnati*[17] does not change this result.  In

*Pembaur*, a county prosecutor authorized deputy sheriffs to forcibly enter the plaintiff's business

property to serve a subpoena, in violation of plaintiff's Fourth Amendment rights.[18]   The

plaintiff sued the county, sheriff, and county prosecutor, among others, contending that the

deputy sheriffs acted pursuant to a policy established by the county prosecutor, even though this

type of incident had only occurred on one occasion.[19]  Notably, the prosecutor made a case-

specific decision over the telephone to specifically authorize the deputy sheriffs' unlawful

action.[20]  The court found that the single decision by the municipal policymakers to violate a

---

[16]  *Id.*

[17]  475 U.S. 469 (1986).

[18]  *Id.* at 472-73.

[19]  *Id.* at 473-74.

[20] *Id.* at 473.

constitutional right represented official policy.[21]  Here, in stark contrast, there is no evidence that

Weber County official deliberately took any direct action that increased the risk to Plaintiffs.

Plaintiffs also cite *Martini v. Russell* for the proposition that particularly egregious

behavior may be enough to infer a custom of such behavior.  Assuming for the sake of argument

that this is a correct statement of the law, there is no evidence here that jail guards engaged in any

egregious behavior.  Referring to Mr. Wardleigh's grievance letter, Plaintiffs argue that there is

evidence that guards cheered on an hours long sexual assault on prisoners, which could be used

to infer a custom.  As already explained, however, that grievance letter is not competent evidence

here.  The admissible evidence on the record does not reasonably support an inference that the

guards engaged in behavior so egregious as to infer a custom of encouraging or allowing sexual

assaults on prisoners.

### B.      Sheriff Slater

Plaintiffs assert that Sheriff Slater's lax supervision and deliberate indifference to

prisoner safety led to the violations at issue.  But Plaintiffs have not shown any evidence that

Sheriff Slater loosely enforced prisoner safety rules or disregarded prisoner safety as a general

---

[21] *Id.* at 484-85.

matter.[22]  Moreover, Plaintiffs have presented no facts that would support the conclusion that

Sheriff Slater ordered or acquiesced to rules violations on the night of the violations at issue.  To

the contrary, Plaintiffs have provided nothing that contradicts Sheriff Slater's evidence that on

the night of May 22 and afterwards, jail officials complied with applicable safety rules.

### III.  PLAINTIFF'S MOTION FOR SANCTIONS DUE TO SPOLIATION OF EVIDENCE

Plaintiffs move for sanctions, up to and including adverse judgment, because the

recordings of the adjacent cell and the recordings of the Plaintiffs' cell after 1:25 a.m. were

written over.  "Spoliation sanctions are proper when '(1) a party has a duty to preserve evidence

because it knew, or should have known, that litigation was imminent, and (2) the adverse party

was prejudiced by the destruction of the evidence.'"[23]  If a party seeks an adverse inference as a

remedy for the spoliation, it must also prove bad faith.  "'Mere negligence in losing or destroying

records is not enough because it does not support an inference of consciousness of a weak case.'

Without a showing of bad faith, a district court may only impose a lesser sanction."[24]

---

[22]  Plaintiffs contend that the video for the second half of the night (after 1:25 A.M.) would demonstrate a failure to supervise because it "would have shown that the guards must have at least seen the second set of assaults that took place that night."  This argument is speculation because the video showed the activity in the jail cells, not the control room.  The four hours of recordings that do exist show only part of Plaintiffs' cell and, due to obstructions between the camera and the inmates in the cell, shows only part of the inmates' bodies when they are in the camera's field of view.  Additionally, because the guards in the control room have several duties and monitor dozens of cells, there is no way to determine from the surveillance video of one or two cells that the guards, at least 67 feet away and looking into dozens of darkened cells, must have seen a brief moment of activity in one cell.

[23]  *Turner v. Public Serv. Co. of Colo.*, 565 F.3d 1136, 1149 (10th Cir. 2009) (citation omitted).  *See also Henning v. Union Pacific Railroad Co.*, 530 F.3d 1206, 1220 (10th Cir. 2008).

[24]  *Turner*, 565 F.3d at 1149-50 (citations omitted).

In *Henning*, Union Pacific sent some requested dispatcher tapes to its claims agent several days after an accident.[25]  Later, Union Pacific discovered that it had sent the wrong tapes.[26]  "By the time the error was discovered, the original tape had been destroyed, pursuant to company policy."[27]  The district court found, however, that the plaintiff in the case "failed to show the tapes were relevant or that their destruction was anything but inadvertent."[28]

Similarly, in *Turner*, the defendant company had mailed interview notes to its central office and the notes were lost in transit.[29]  The plaintiff argued that as a sanction for spoliation the court should have drawn an adverse inference that the lost notes would have proved the plaintiff's claim of pretext to support her claim of discrimination.[30]  The court affirmed summary judgment for the defendant, finding that the district court did not err in concluding that even if the defendant were negligent in losing the notes, it could not create a triable issue of fact.[31]

Here, there is no evidence that Defendants allowed evidence to be destroyed intentionally or in bad faith.  Shortly after receiving a grievance from Mr. Wardleigh's father on May 23, 2007, Defendants recorded four hours of recordings from the camera in Plaintiffs' cell that appeared to be relevant to the alleged incident.  Approximately six months later, Plaintiffs

---

[25]  530 F.3d. at 1219.

[26]  *Id.*

[27]  *Id.*

[28]  *Id.*

[29]  563 F.3d at 1149.

[30]  *Id.* at 1150.

[31]  *Id.*

requested recordings relating to the incident and Defendants provided the previously-recorded DVD.  More than two months after receiving the recordings, Plaintiffs made an additional request for recordings covering a neighboring cell and Plaintiffs' cell at a later time.  Only then did jail officials discover that recordings from that time period had not been preserved in camera memory.  Moreover, unlike the policy-based destruction of recordings in *Henning*, the recordings Plaintiffs requested nine months after the alleged incident were not intentionally removed or destroyed, but were automatically overwritten by a digital video surveillance system with finite memory.  On this record, the evidence is insufficient to support an adverse inference of wrongdoing by the Defendants or to create a triable issue of fact on whether the Plaintiffs have met the burden necessary to avoid summary judgment.

Plaintiffs have also failed to show that the Defendants had any reason to know that the requested recordings were relevant.  First, Plaintiffs claim the recording of the neighboring cell would show the inmates there banging on the partition between the cells while Plaintiffs exposed themselves and walked across their cell around 11:00 p.m.  But there was no mention of this banging on the cell partition in the grievance Mr. Wardleigh submitted to the jail.  As a result, when jail personnel transferred the recording from the camera onto DVD shortly after receiving the grievance, they had no reason to know that the recording of the neighboring cell might be relevant.

Additionally, Plaintiffs claim that recording after 1:25 a.m. would show the another inmate climbing on top of Mr. Wardleigh and Mr. Hayes in their bunks.  But the grievance letter Mr. Wardleigh submitted described these incidents as occurring later that night.  Moreover, Plaintiffs admit in their depositions that the other inmate climbed on top of them approximately

13

one half to one hour after the initial incident.  Following this time frame, the latest time at which
the recording might have shown the events with the other inmate was about 12:00 a.m.  As a
result, there is no support for the proposition that recordings made one and a half hour later
would show this activity.  Plaintiffs proffer reasons for requesting these additional recordings,
but none make clear how or why Defendants should have known that other recordings would
later be important to Plaintiffs.

Finally, even if the lost recordings at issue showed more harassment of the Plaintiffs, that
would still not help Plaintiffs because there is no *respondeat superior* liability under § 1983.
That is, even if Plaintiffs got an adverse inference that the guards on duty ignored the harassment,
the Plaintiffs would still have to show that Sheriff Slater, in his supervision of the jail, had some
direct personal responsibility for or acted with deliberate indifference toward the treatment
Plaintiffs received.  Similarly, to establish municipal liability, Plaintiffs would need to show that
Weber County made a deliberate policy choice leading to the constitutional violations here.
Plaintiffs do not demonstrate how the requested recordings would demonstrate any such policy
choice by Weber County.

In sum, Plaintiffs have not established that sanctions are appropriate for the spoliation of
the recordings at issue.  Moreover, even if the court were to consider sanctions, it Plaintiffs have
not established that the available sanctions would allow Plaintiffs to prevail.  Therefore,
Plaintiffs' motion for sanctions due to spoliation of evidence is DENIED.

14

## CONCLUSION AND ORDER

For the reasons stated above, the court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiffs' Motion for Sanctions Due to Spoliation of Evidence.

DATED this 28th day of January, 2010.

BY THE COURT:

_____

Clark Waddoups
United States District Judge